**Opinion filed April 15, 2010**



## In The

# Eleventh Court of Appeals

_____

## No. 11-08-00133-CR

_____

## THOMAS JACINTO LOPEZ, III, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 385th District Court**

**Midland County, Texas**

**Trial Court Cause No. CR33628**

## O P I N I O N

The jury convicted Thomas Jacinto Lopez, III of theft over $100,000 but less than $200,000. Based on the trial court's finding of "true" on a prior felony conviction alleged for enhancement purposes, the trial court sentenced appellant to confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of forty-five years. The trial court also ordered appellant to pay restitution of $108,344. Appellant challenges his conviction in four issues. We affirm.

*Background Facts*

Kay Stephenson Hill and Thomas Leroy Hill met appellant on July 25, 2006, when he stopped by their home to see if they might be interested in hiring him to perform some repairs on

their home. Appellant told the Hills that, while driving by their home, he had observed some loose bricks and exterior areas that needed to be repainted. He informed them that he had a work crew in the area that could perform these repairs. After discussing the scope of the repairs, the Hills executed a written contract with appellant on July 25, 2006, for him to repair the loose bricks and perform other miscellaneous repairs around the home for the total price of $4,871.25. The Hills paid appellant a down payment of $2,500 at the time that the initial written contract was executed.

Appellant and his crew started working on the Hills' home within a couple of days after executing the initial written contract. Soon after appellant began working on the Hills' home, he and the Hills entered into a discussion about their desire to make additional changes to their home. Appellant and the Hills executed a second written contract for him to install new windows, a French door, and a new garage door at their home for a total price of $13,085. This contract also included additional work to repair loose bricks around the Hills' home. The Hills paid appellant an additional $5,456 as a down payment on the second written contract.

On August 11, 2006, the Hills executed a third written contract with appellant for him to install handicap accessible sidewalks and driveways around their home to accommodate Mrs. Hill's use of a wheelchair. The total price of this written contract was $13,531.25 of which the Hills paid $6,500 at the time of its execution as a down payment. Accordingly, the Hills had executed three written contracts with appellant within three weeks of their initial meeting for him to perform work on their home in the total amount of $31,487.50.

During the course of appellant's work on the Hills' home, he reported additional items to them that were purportedly in need of repair. One of these items involved their chimney. Appellant informed the Hills that their chimney could potentially be leaking dangerous gas into their home. Other items "discovered" by appellant included the lack of adequate foundation underneath the house, deficient ceiling trusses, termite damage in the attic, and insufficient insulation. Appellant agreed to repair these items for the Hills for additional compensation.

Appellant's work on the Hills' home extended into 2007. The working relationship between appellant and the Hills deteriorated during the course of the project. Mrs. Hill testified that appellant began failing to show up with his crew to work on the house and that he was often late or unprepared to do the work that he and his crew were scheduled to do on a given day. She

testified as follows in this regard: "What we learned was that he was not going to be there when he said he would be there; and when he came, he would not be ready to work; and when he worked, he wouldn't get the work done that he said he would do."

Mrs. Hill testified that appellant's work on their home came to a halt for a two-week period in February 2007. Virtually every project that appellant had agreed to perform remained unfinished at this time. Mrs. Hill estimated that appellant had not completed two-thirds of the work on the house as of this time. When the Hills threatened appellant with legal action, he resumed work on the house. Appellant and his crew worked on the house for three additional weeks, but then he stopped working again. Mrs. Hill estimated that appellant had completed one-half of the work on the house as of this time.

As of April 2007, the Hills had made payments in excess of $161,000 to appellant. A part of these payments consisted of $15,735.54 that appellant charged the Hills for fees and bonds that he purportedly was required to purchase from the City of Midland in order to perform work on their home.[1] Frustrated by appellant's lack of performance, the Hills contacted the building inspector for the City of Midland, Richard Schwope, to determine if appellant had obtained the necessary permits for their remodeling project. Schwope determined that appellant had not obtained any permits for working on the Hills' home.[2] Schwope additionally determined that appellant had not submitted proof of a surety bond to the city as required by city ordinance in order to obtain construction permits as a contractor in the city.

The Hills confronted appellant at his home after learning that he had not paid any fees to the city to obtain construction permits for their home. Appellant began crying when confronted by the Hills, and he pleaded for them not to contact the police. He subsequently wrote a letter of apology that read as follows:

Letter of Apology
To Kay Hill                                                                          4/9/07
I would like to say Mrs. Hill that I'm sorry for lieing [sic] to you about the city
bond fee. I'm very sorry for charging you fees that were at all not necessary. I'm

---

[1]The items charged by appellant for fees and bonds consisted of the following: (1) City Construction Bond - $2,500; (2) Footing Fee - $343.85; (3) City Environmental Fee - $426; (4) City Bond to Repair Chimney - $1,500; (5) Fee Curb Cut - $375.69; (6) Bond Curb Cut - $1,500; (7) City Bond to Rebuild Chimney - $1,975; (8) Gas Line Inspection - $900; (9) City Environmental Fee - $225; (10) Curb Cut Fine - $1,320; (11) Chimney Bond Renewal - $3,870; and (12) Additional Bond for Chimney - $800.

[2]Schwope testified that appellant was only required to obtain a single building permit for the work to be performed on the Hills' home at a cost of $5.25 per each $1,000 of the cost of construction and to pay a single curb cut fee of $25.

sorry because I know I hurt you emotionally and I feel bad cause you had to get out of bed when you hurt to wait for us to come work. I'm sorry for the days I stood you up. I promise not to lie to you or anybody else. I promise to tell the truth no matter what the facts are. The truth will have to be told the way it is. Once again Mrs. Hill, I'm sorry for all the pain and suffering I put you through. Thank you. /s/ T.J. Lopez

Appellant ultimately entered into an agreement with the Hills to pay back the $15,735.54 he collected for city fees and bonds at the rate of $14 a week. He made five payments under this arrangement, but he ceased making the payments after he was arrested.

Another significant portion of the total payments in excess of $161,000 that the Hills made to appellant were personal loans to appellant. The Hills made loans in excess of $38,000 to appellant over the course of their working relationship. The Hills made these loans based upon appellant's statements to them regarding various financial difficulties that he was purportedly encountering.

The State offered the testimony of Lance Friday, a local contractor, regarding the necessity of many of the repairs suggested by appellant to the Hills. He testified that the attic trusses that appellant indicated needed to be repaired were not defective because the house was properly framed when it was built. Additionally, he testified that appellant's work on the trusses did not strengthen them. Friday additionally testified that the original foundation of the Hills' home was sufficient and that the additional footing that appellant poured around the home did nothing to help support the structure. He did not observe any evidence of termite damage in the attic of the home. He also did not observe any problems with the chimney requiring the repairs to it that appellant performed. Friday additionally did not find that appellant installed insulation in any significant amount in the house.

During the guilt/innocence phase, the State additionally called several other individuals who had hired appellant for construction projects as witnesses to testify about their experiences with appellant. Their testimony is summarized as follows:

- Paul West hired appellant in January 2007 to do brickwork on a new home construction project. He agreed to pay appellant $8,000 to brick the home. West paid appellant $5,000 to brick the home, but appellant only completed approximately half of the work. West entered into a separate contract with appellant to do footings and brickwork on columns on the home for $2,000. West paid appellant the entire $2,000, but appellant did not do any of the

work. Appellant told West that he would return the money that West advanced to him for work that was not done, but appellant failed to do so.

- Robert Pfile's wife hired appellant to perform electrical work on two rent houses in February 2007. The Pfiles met appellant a year earlier when he came to their home offering to do brick repair. He came to their home in February 2007 offering to do the brick repair work a second time. Appellant informed them that he was a master electrician when in fact he was not. Mr. Pfile testified that his wife paid appellant $19,000 over the course of a week for the work he agreed to perform in rewiring the rent houses. Mr. Pfile testified that appellant did very little work on the houses and that a qualified electrician had to be hired to re-do the work that appellant had performed because it did not comply with code requirements. When confronted by Mr. Pfile, appellant agreed to pay back $10,000, but he never did repay the money. Manuel Beltran, a detective with the Midland Police Department that has extensive experience in the construction industry, testified that appellant did not actually rewire the houses. In many instances, appellant merely installed new switches and electrical outlets to the original wiring in the houses.

- Maria Gabriela Ramos hired appellant in March 2007 to remove the flat roof on her family's home and replace it with a pitched roof. Appellant also agreed to add a small room to the house and replace some windows. Appellant agreed to do the work for a total of $13,500. Ramos paid appellant $11,800 toward the agreed upon amount. However, appellant only completed a small portion of the project because he stopped working on the project after the third day of work. At the time that he stopped working on Ramos's house, he had only removed the flat roof that previously existed. Thus, appellant left Ramos's family with a house that did not have a roof. Appellant told Ramos that he would give her one-half of her money back, but he never did.

- Perry Taylor hired appellant to perform some brickwork in March 2007. He and appellant signed a written contract in the amount of $10,500 to perform the work. Taylor paid appellant all of the money, but appellant did not perform all of the work required under the contract. Taylor estimated that appellant did not complete approximately $2,500 to $3,000 of the work that he agreed to do. Appellant agreed to perform additional work for Taylor at a cost of $2,100. Taylor paid appellant $2,100 for this work, but appellant did not complete it. Taylor also loaned appellant $1,500 to assist with jobs that appellant was performing for other individuals. However, appellant did not repay the loan back to Taylor.

- In March 2007, Pat Magers's contractor, Brent Bates, hired appellant to demolish a structure. Appellant performed the demolition work, but he did not clean up the debris left by the demolition. Appellant also agreed to supply a heating/air conditioner system to Magers for a total cost of $5,800. Magers

5

paid appellant $4,500 up front for the system equipment, but appellant never delivered the system or paid the money back. Appellant subsequently paid Magers $1,000 of the $4,500 back.

- Roy Hearon hired appellant to paint his house in April 2007. Appellant agreed to perform the work for $1,800. Hearon paid him $1,000 up front, but appellant neither painted his house nor returned the $1,000 that Hearon had paid him.

- Mark Ament hired appellant in March 2007 to build a garage for the price of $15,000. Ament paid appellant $2,000 up front for the project and made subsequent payments totaling $7,500, but appellant stopped working on the project. Ament noticed at the outset that appellant did not build the garage in an acceptable manner. Ament also testified that appellant lied to him about obtaining the necessary construction permit. Ament testified that appellant agreed to return $2,500 of the money paid to him but that he never paid the money back.

- Aloise Kuykendall hired appellant in March 2007 to paint and perform grout work on her home for a total price of $5,412. She paid appellant $3,412 up front for the work. Some of appellant's workers came to work on the project. Their work was unacceptable, and they did not complete the project. Kuykendall had to hire others to re-do their work. Appellant did not refund any of the money that Kuykendall paid him for the project.

## Sufficiency of the Evidence

Appellant challenges the legal sufficiency of the evidence in his first issue. To determine if the evidence is legally sufficient, we must review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Jackson v. State*, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000). When conducting a sufficiency review, we consider all the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001); *Garcia v. State*, 919 S.W.2d 370, 378 (Tex. Crim. App. 1994); *Chambers v. State*, 805 S.W.2d 459, 460 (Tex. Crim. App. 1991). The finder of fact is the sole judge of the weight and credibility of the witnesses' testimony. TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979). We presume that the jury

6

resolved conflicts in the evidence in favor of the prosecution, and we defer to that determination in reviewing the sufficiency of the evidence. *Jackson*, 443 U.S. at 326.

Our analysis of appellant's challenge to the legal sufficiency of the evidence focuses on a review of the mathematical calculations presented at trial. As noted previously, the Hills made payments in excess of $161,000 to appellant. The jury convicted appellant of second degree theft of between $100,000 and $200,000. *See* TEX. PENAL CODE ANN. § 31.03(e)(6) (Vernon Supp. 2009). Accordingly, we must determine if any rational trier of fact could have found beyond a reasonable doubt that appellant committed theft against the Hills in an amount of at least $100,000.

A person commits theft "if he unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE ANN. § 31.03(a) (Vernon Supp. 2009). Appropriation of property is unlawful if it "is without the owner's effective consent." TEX. PENAL CODE ANN. § 31.03(b)(1) (Vernon Supp. 2009); *Stewart v. State*, 44 S.W.3d 582, 589 (Tex. Crim. App. 2001) (the "crucial element of theft is the deprivation of property from the rightful owner, without the owner's consent"). "Consent" is not effective if it is induced by deception. *See* TEX. PENAL CODE ANN. § 31.01(3)(A) (Vernon Supp. 2009). The Texas Penal Code defines "deception" as follows:

"Deception" means:

(A) creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true;

(B) failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true;

(C) preventing another from acquiring information likely to affect his judgment in the transaction;

(D) selling or otherwise transferring or encumbering property without disclosing a lien, security interest, adverse claim, or other legal impediment to the enjoyment of the property, whether the lien, security interest, claim, or impediment is or is not valid, or is or is not a matter of official record; or

7

(E) promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed.

TEX. PENAL CODE ANN. § 31.01(1)(A)-(E) (Vernon Supp. 2009). Thus, the Penal Code provides five alternative methods of committing theft by deception.

Appellant focuses his legal sufficiency challenge on the method of deception set out in Section 31.01(1)(E). This subsection provides that an actor engages in deception if he promises performance that he does not intend to perform or knows will not be performed. Most theft convictions resulting from contractual civil disputes arise under this "failure to perform" subsection. In the typical scenario, the actor agrees to perform a service, accepts money for the service, but then ultimately fails to perform the service. A claim of theft in this situation requires proof of more than an intent to deprive the owner of property and subsequent appropriation of the property. *Baker v. State*, 986 S.W.2d 271, 274 (Tex. App.—Texarkana 1998, pet. ref'd). "If no more than intent and appropriation is shown in a contract claim, nothing illegal is apparent, because under the terms of [a contract] individuals typically have the right to 'deprive the owner of property,' albeit in return for consideration." *Id*. Stated another way, if money was voluntarily given to the accused pursuant to a contractual agreement and there is insufficient evidence in the record to show the money was obtained by deception, the conviction cannot stand. *Phillips v. State*, 640 S.W.2d 293, 294 (Tex. Crim. App. 1982). Thus, to constitute theft in a contract situation, the evidence must show that the accused intended to deprive the owner of the money advanced under the contract at the time the money was accepted by the accused. *See Wilson v. State*, 663 S.W.2d 834, 836-37 (Tex. Crim. App. 1984) ("Relevant intent to deprive the owner of property is the accused's intent at the time of the taking.").

Texas courts have held that, if a contract is partially or substantially performed, then the intent to commit theft through deception is not shown by the evidence. *See Baker*, 986 S.W.2d at 275. Appellant relies on this principle to assert that the evidence negates his culpability for theft by deception because he partially performed his agreement to work on the Hills' home. We agree that an actor's partial performance under a contract may negate his criminal culpability in

the context of the "failure to perform" ground of deception. As set out above, however, Section 31.01(1) lists additional grounds by which an actor may commit theft by deception.

Section 31.01(1)(A) provides that an actor engages in deception by "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true." The State relied heavily upon this ground for establishing appellant's guilt for theft by deception.[3] For example, appellant represented to the Hills that they owed thousands of dollars in fees and bonds to the City of Midland in order for the construction project to occur. As evidenced by his letter of apology to Mrs. Hill, appellant created a false impression of law or fact that he knew was not true that induced the Hills to pay him $15,735.54 for the bogus fees. The fact that appellant may have partially performed under the contract is irrelevant to an inquiry as to whether he acquired funds from the Hills without their effective consent by creating a false impression of law or fact. Accordingly, we conclude that evidence of partial performance under a contract is not relevant to a charge that an actor induced the property owner's consent to advance funds under a contract by creating a false impression of law or fact.

As noted previously, the State offered evidence that many of the alleged flaws that appellant identified to the Hills with their home were not defective or deficient. These items included the purported problems with the Hills' chimney, foundation, attic trusses, and termite damage. The State contends that appellant's work on these items constituted unnecessary repairs and that the amounts that appellant charged the Hills for these unnecessary repairs were obtained by deception. We conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant induced the Hills to advance funds to him for these unnecessary repairs by creating a false impression of law or fact regarding their necessity. Detective Bill Anderson, another Midland police officer with construction experience, testified that appellant charged the Hills $27,425 for work done on the chimney;[4] $8,219 for the foundation work; and $18,300 for work done in the attic for trusses, alleged termite damage, and insulation. Thus, the State offered evidence that appellant charged the Hills $53,644 for unnecessary repairs.

---

[3]The court's charge included the methods of perpetrating deception set out in Section 31.01(1)(A), (B), (C), and (E) in its definition of "[d]eception."

[4]In addition to charging the Hills $27,425 for unnecessary repairs to their chimney, he also collected $8,145 from them for bogus permit fees for the work on the chimney.

In addition to the $15,735.54 that appellant collected from the Hills for bogus permit fees and the $53,644 he charged them for unnecessary repairs, he also borrowed $38,945.79 in personal loans from them. Appellant informed the Hills of various financial problems he was having when he obtained these loans. Mr. Hill testified that appellant told him that his bookkeeper/accountant had stolen money from him and fled to the Cayman Islands. Mr. Hill described the conversations leading up to appellant asking for loans as follows:

> Usually he would come in and say, you know "I'm really short on cash because my accountant has cleaned out my account; my funds are tied up; that the bank would not loan me any more money until we -- this was resolved." It was all in the process. I believe what he said was his accountant had been arrested, and that a good bit of the money that he had taken from Mr. Lopez and others, had been found -- or at least the Court had managed to turn up a bunch of it; and it was all sitting in the Court Clerk's hand; and eventually they were going to sort it all out as to how much would be proportioned out to certain people that were all victims.
>
> And so it was going to be tied up for a while, and he needed something to tide him over until then.

Appellant also stated that he needed money to complete projects for other customers and that he needed money to re-incorporate his business. Detective Anderson determined that appellant's story about his accountant was a sham. Additionally, the testimony from appellant's other customers with regard to funds they advanced to him for projects demonstrated that he was not in dire financial straits. Accordingly, a rational trier of fact could have found beyond a reasonable doubt that appellant induced the Hills to loan money to him by creating a false impression of law or fact regarding his financial difficulties and its causes.

Additionally, Mrs. Hill testified that she paid appellant $2,100 for Pella windows and $1,000 for a credenza that he never delivered. She also testified that twenty-five percent of the work that appellant agreed to complete remained unfinished. The testimony of appellant's other customers reveals a pattern of conduct on his part to agree to perform work with no intention of completing it. Based upon their testimony, a rational trier of fact could have found beyond a reasonable doubt that appellant did not intend to deliver the windows and credenza or complete the work he agreed to perform at the time he accepted funds for these projects from the Hills. Accordingly, the record contains legally sufficient evidence to support the jury's determination

10

that appellant committed theft by deception against the Hills in an amount in excess of $100,000. Appellant's first issue is overruled.

*Evidence of Appellant's Dealings with Other Customers*

In his second and third issues, appellant challenges the admission of evidence pertaining to his dealings with other customers. He contends in his second issue that the admission of this evidence violated TEX. PENAL CODE ANN. § 31.03(c)(1) (Vernon Supp. 2009). He asserts in his third issue that the admission of this evidence violated TEX. R. EVID. 404(b). We review the trial court's ruling on the admissibility of evidence under an abuse of discretion standard. *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001); *Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1991). This standard requires an appellate court to uphold a trial court's admissibility decision when that decision is within the zone of reasonable disagreement. *Powell*, 63 S.W.3d at 438.

Section 31.03(c)(1) provides that "evidence that the actor has previously participated in recent transactions other than, but similar to, that which the prosecution is based is admissible for the purpose of showing knowledge or intent and the issues of knowledge or intent are raised by the actor's plea of not guilty." Appellant asserts that another transaction must be identical to the charged offense in order to be admissible under the statute. We disagree. The statute only requires that another transaction be similar to the charged offense in order to be admissible. We conclude that the trial court did not abuse its discretion in determining that the other transactions, which all occurred during the period of time that appellant was also working on the Hills' home, were similar to the transaction giving rise to the charged offense. Appellant's second issue is overruled.

Evidence of other crimes, wrongs, or bad acts is not admissible for the purpose of showing that the person acted in conformity therewith. Rule 404(b); *Montgomery*, 810 S.W.2d at 386-88. However, this evidence may be admissible when it is relevant to a "noncharacter conformity fact of consequence in the case," such as intent, motive, identity, opportunity, preparation, plan, knowledge, or absence of mistake or accident. *Powell*, 63 S.W.3d at 438; *see* Rule 404(b); *Montgomery*, 810 S.W.2d at 387-88. Admissibility of evidence hinges on the relevancy of the evidence to a "fact of consequence" in the case. *Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996). Other crimes, wrongs, or bad acts have noncharacter

11

conformity relevance where it logically serves to make less probable defensive evidence that undermines an elemental fact. *Powell*, 63 S.W.3d at 438.

We conclude that the trial court did not err under Rule 404(b) in admitting the other customers' testimony. The evidence was admissible under both Section 31.03(c)(1) and Rule 404(b) to show appellant's intent. In a theft case arising from a construction contract, the issue of the defendant's intent at the time he received funds under the contract in consideration of his promise to perform future work will invariably be a contested issue at trial. The evidence from the other customers showed that appellant took money for work that he never intended to complete. Appellant's third issue is overruled.

### *Disabled Juror*

In his fourth issue, appellant contends that the trial court erred in proceeding with the trial over his objection after a juror became ill. Appellant claims that the trial court erred in determining that the juror was disabled under TEX. CODE CRIM. PROC. ANN. art. 36.29(a) (Vernon Supp. 2009). On the third day of trial, the proceedings began with the trial court informing the attorneys that a juror had contacted the court to report that she was ill with a stomach ailment and that she would not be able to attend court. The trial court additionally advised the parties that the same juror had informally advised the court on the previous day that she had an upset stomach and was not feeling well. Although appellant objected and requested that the trial be postponed, the trial court chose to proceed under TEX. CODE CRIM. PROC. ANN. art. 36.29 (Vernon Supp. 2009). Prior to making its determination to proceed with eleven jurors, the trial court polled the remaining jurors to ascertain their availability in the event the trial was postponed. Six of the remaining jurors indicated it would be difficult for them to come back at a later date, and all eleven of the remaining jurors indicated that they would like for the trial to continue without waiting for the return of the sick juror.

Article 36.29 allows a trial to proceed with fewer than twelve jurors if a juror becomes disabled. A juror is disabled if he has a physical illness, mental condition, or emotional state that hinders his ability to perform his duties as a juror. *Hill v. State*, 90 S.W.3d 308, 315 (Tex. Crim. App. 2002); *Landrum v. State*, 788 S.W.2d 577, 579 (Tex. Crim. App. 1990). A disability for purposes of Article 36.29 includes any condition that inhibits a juror from fully and fairly performing the functions of a juror. *Routier v. State*, 112 S.W.3d 554, 588 (Tex. Crim. App.

12

2003). The determination as to whether a juror is disabled lies within the sound discretion of the trial court. *Brooks v. State*, 990 S.W.2d 278, 286 (Tex. Crim. App. 1999). Absent an abuse of that discretion, no reversible error will be found. *Id.*

Appellant contends that an upset stomach is insufficient to render a juror disabled because such an illness is temporary. However, other courts have found that jurors who complained of other temporary illnesses that impaired their ability to perform the functions of a juror were properly determined by the trial court to be disabled. *See Allen v. State*, 536 S.W.2d 364, 366-67 (Tex. Crim. App. 1976) (juror properly determined to be disabled after having been diagnosed with influenza); *Hughes v. State*, 787 S.W.2d 193, 195 (Tex. App.—Corpus Christi 1990, pet. ref'd) (juror excused after complaining of nausea, headaches, and vomiting). A juror's inability to come to the courthouse due to a stomach ailment provides some evidence of the requisite incapacity to perform the duties assigned to that juror that the trial court may consider in making a determination of disability. Although some stomach ailments might be only temporary, it remains within the trial court's discretion to determine whether the juror had become disabled. Therefore, the record does establish that the trial court abused its discretion in determining that the juror's ailment rendered her disabled. Furthermore, Article 36.29 does not require the trial court to consider postponing the trial prior to proceeding with eleven jurors in the event of a juror's disability. Thus, the remaining jurors' preference for proceeding with the trial is of no consequence to a disability determination under Article 36.29. Appellant's fourth issue is overruled.

### This Court's Ruling

The judgment of the trial court is affirmed.

TERRY McCALL

JUSTICE

April 15, 2010

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.