*861 JACK CARTER, Justice,
dissenting.
I agree with the majority’s conclusion that a reasonable fact-finder could have believed that Taylor induced Reich to make a $10,000.00 payment by falsely representing that the signs were ready for shipment when they were not. However, it does not necessarily follow that theft was committed. The contract in this case required a down payment of $14,657.25, ■with an additional $10,000.00 payment to follow at the time of pick up. Although the time of pick up may have been misrepresented, the signs were eventually shipped and received by Taylor. This case is thus distinguished from Higginbotham v. State, 356 S.W.3d 584 (Tex.App.-Texar-kana 2011, pet. ref'd).[17]
In Baker v. State, 986 S.W.2d 271 (Tex.App.-Texarkana 1998, pet. ref'd), this Court acknowledged that if a contract is partially or substantially performed, as here,[18] intent to commit theft through criminal fraud or deception is not shown by the evidence. Id. at 274-75; see also Lopez v. State, 316 S.W.3d 669, 676 (Tex.App.-Eastland 2010, no pet.). When, however, there is specific proof that funds paid for a project weré not used for the project, an exception exists. Baker, 986 S.W.2d at 275.
In that case, Baker acted as a general contractor to build a house for James. Baker was added as a signatory to James’ checking account, opened for the purpose of holding the funds needed to build James’ new home. Baker wrote various checks to pay for construction work, two of which were made out to cash with the notation that they were to be used for a particular purpose. Even though there was undisputed evidence that Baker performed a substantial portion of the overall work on the hoüse, there was evidence that Baker took some of the funds for his own benefit and fraudulently concealed that those funds were not used for purposes of the contract.[19] Based on this proof, this Court determined that the evidence was sufficient to support Baker’s theft conviction.
*862 In light of Baker, it is appropriate to analyze the record to determine whether there is specific proof that any of the funds paid to Taylor were diverted from the project. In this case, unlike Baker, there is no such evidence.
At Yocum’s insistence, Taylor produced an invoice in January showing that four LED signs were ordered from Affordable LED at a cost of $22,600.00. A handwritten notation on this invoice indicates that the signs were paid in full by credit card. The credit card number was written on the invoice. Yocum testified, “As a business person I know that that doesn’t happen. So that caught my attention and it made me question the whole thing.” The veracity of this invoice is further impugned by Taylor’s own testimony that he only ordered two signs from Affordable LED. Taylor never attempted to explain the initial invoice from Affordable, why four LED signs were not timely received pursuant to this supposedly fully paid invoice, and why a second order was placed with Affordable for additional LED signs in February 2011. A reasonable fact-finder could conclude, from this evidence, that the November 18 invoice from Affordable was not “paid in full” and was, in fact, bogus.
The second invoice from Affordable LED in February 2011 shows an amount due of $9,470.00 for two LED signs. This invoice is stamped “PAID 03/07/2011.” The invoice from Elite Signs indicating a cost of $11,600.00 for two LED signs reflects payment by money order. These sums total $21,070.00. After the initial down payment of $14,657.25, the balance on the total cost of the signs amounts to $6,412.75. Yet, Taylor was paid an additional $10,000.00, the full extent of which was not needed to satisfy this balance. The remaining $3,587.25 could not have been used to pay for LED signs.[20]
Even though a reasonable fact-finder could determine that the excess funds were not used to purchase LED signs, there is no proof that this money was diverted from the project. The invoice lists three specific projects: (1) the purchase of four LED signs, (2) the installation of a 6' x 8' tenant sign in Kilgore, and (3) the installation of wire for the tenant sign. The evidence is undisputed that Taylor installed the tenant sign at the Kilgore location. Taylor did not, however, complete the wiring for this sign. The invoice lists the tenant sign cost as $3,750.00 and the cost of wire for that sign as $1,100.00. The money paid to Taylor, over and above the sign cost of $3,587.25, closely approximates the amount due Taylor for construction of the tenant sign at the Kil-gore location.
This case involved a contract which specifically required Reich to pay Taylor $10,000.00 before the signs could be shipped. While this money was probably paid prematurely, there is no evidence it was diverted from the project. Taylor spent at least $6,412.75 of this sum (in addition to the initial payment of $14,657.25) on purchasing LED signs pursuant to the contract. The contract required a payment of $3,750.00 to Taylor for construction of the tenant sign at the Kilgore location. Reich never contended Taylor was not due these funds, and there is no dispute this work was performed. Because there is no evidence that any funds were diverted from the project, I *863 would find the evidence insufficient to support the conviction.

. In that case, Higginbotham contracted to construct a log home for Huff for $228,919.00. In connection with this contract, Higginbotham submitted a bill to Huff for cabinets in the amount of $9,280.00. Higginbotham never paid for the cabinets. Huff, therefore, paid the cabinet subcontractor directly. Higginbotham testified that he and Huff subsequently agreed to apply the cabinet draw to other expenses. Higginbotham, 356 S.W.3d at 589. Huff denied having agreed to apply the cabinet down payment to other expenses. Id. at 590. We ■concluded that a rational juror could have believed Huff’s testimony over Higginbotham’s testimony. Id.

. Here, the contract was at least partially performed. Taylor completed various aspects of the agreed-to work: he obtained a permit for the installation of the multi-tenant monument sign; he constructed and installed the multi-tenant monument sign; he obtained a permit for renovation of the sign at the Lock Box; he removed the old pole sign at the Lock Box and installed a new one in its place; he performed painting work at the Lock Box; he delivered signage to the Lock Box on two different occasions, although it was never installed; he ordered and received four LED signs which he still had at the time of trial; and, he applied for and received an LED sign permit from the City of Longview.

.The initial check, in the amount of $4,800.00, included a notation that it was to be utilized for the concrete slab. The second check, in the amount of $1,150.00, included a notation that it was to be utilized for rough-in plumbing. Baker, 986 S.W.2d at 275. James testified that Baker did nothing toward the concrete work personally and that she wrote a check directly to the concrete contractor. Baker refused to furnish an invoice for the concrete work. The plumber testified that he received no cash in connection with his work and that he only received one check from James that did not cover'the total cost of his work. Id.

. This amount was not profit to Taylor, as the invoice specifically provides that Taylor was to receive $4,657.00 when the signs were "up & finished.” This amount was never paid.