

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00195-CR

_____

CHARLES CODY LYON, Appellant

V.

The State of Texas

_____

On Appeal from the 415th District Court
Parker County, Texas
Trial Court No. CR13-0619

_____

Before Meier and Birdwell, JJ.; and Rebecca Simmons, J. (Sitting by Assignment).
Memorandum Opinion by Justice Simmons

## MEMORANDUM OPINION

A jury convicted Appellant, Charles Cody Lyon, of theft of property with an aggregated value greater than $200,000. *See* Tex. Penal Code Ann. §§ 31.03(a), (b) (West Supp. 2018); Act of May 9, 2011, 82nd Leg., R.S., ch. 120, § 1 (e)(6), 2011 Tex. Gen. Laws 609, 610 (amended 2015) (current version at Tex. Penal Code Ann. 31.03(e)(6)); 31.09 (West 2016). The trial court sentenced Lyon to thirty years in the Texas Department of Criminal Justice Institutional Division, and ordered restitution to all victims in the aggregated amount of $245,456.89. In fourteen issues Lyon challenges the sufficiency of the evidence and the sufficiency of the indictment.

## Background

The State indicted Lyon for aggregated theft of property in an amount greater than $200,000 pursuant to one scheme and continuing course of conduct.[1] The superseding indictment of October 22, 2015, contained allegations in seventeen separate paragraphs describing thefts that were aggregated pursuant section 31.09[2] of the Penal Code. Because we will describe the facts more thoroughly as we analyze each of Lyon's sufficiency issues, we include only a short summary to provide context.

---

[1]The charge included lesser included offenses of theft of lesser amounts including theft of the value of $100,000 or more but less than $200,000.

[2]The State abandoned the allegations in paragraphs 11 and 12 of the indictment before trial.

Lyon worked in the agriculture field buying, selling, and applying fertilizer, as well as buying and selling seed and other goods. In late 2012 Lyon ordered and received seven truckloads of liquid agricultural fertilizer from Poole Chemical Co. Inc. (Poole) valued at approximately $73,000. Lyon paid Poole with a series of checks that were returned by the bank for insufficient funds.[3] Lyon hired Brian Bourland to drive a portion of the fertilizer purchased from Poole to Leon County and only partially paid Bourland for his services.

Lyon purchased liquid fertilizer from Marc Watson in the amount of $68,000, but Lyon's check was returned for insufficient funds. Likewise, Lyon purchased fertilizer from Donnie Martinek for $8,200 and paid by a check later returned for insufficient funds. Lyon also removed liquid fertilizer from the property of Varian Sisson without paying Sisson.[4] Lyon also agreed to sell fertilizer on behalf of Jay Norman on commission. However, Lyon obtained fertilizer purportedly for Norman's clients and failed to pay Norman, and when Lyon ultimately provided a check, it was returned for insufficient funds. Lyon also used Norman's line of credit without authorization to obtain fertilizer and never paid Norman. There was

---

[3]Lyon did not appeal the sufficiency of the evidence to support the theft of fertilizer from Poole Chemical Co.

[4]The State alleged in paragraph 13 of the third superseded indictment that Lyon removed fertilizer from the property of Stan Stephens without his consent, but the State concedes that the evidence establishes Stephens consented to the removal.

3

evidence in the record that Lyon made small payments to some of the victims, but much of the debt was unpaid.

Most of the paragraphs in the indictment relate to the transactions involving fertilizer. However, two paragraphs of the indictment relate to Donald Cranford's purported investment in Lyon's company, Range Management Services, and the purchase of clay targets for sport shooting. Cranford testified that he gave Lyon $74,000 as an investment in Range Management Services which was never returned, and Lyon transferred $82,910 from Donald Cranford's bank account to Lyon's bank account without any authorization using a forged email.

Prior to trial Lyon attempted to quash the third superseding indictment by filing a motion to quash because the indictment failed to adequately describe the property (fertilizer) alleged to have been appropriated and because it was too indefinite to give adequate notice to prepare his defense. The trial court overruled Lyon's motion to quash.

At trial a large number of banking records from Lyon's accounts and those of his alleged victims were introduced into evidence. Several of the victims also testified at trial. The jury returned a verdict of guilty on the aggregated theft of greater than $200,000 count, and the trial court assessed punishment. The trial court ordered restitution in the total amount of $245,456.89 broken down as follows:

- Poole Chemical $71,031.11
- Jay Norman $4,834.37

4

- Varion Sisson  $4,875.21
- Brian Bourland  $4,192.00
- Stan Stevens $3,700.00
- Marc Watson $65,616.25
- Donald Cranford $82,910.00
- Donnie Martinek $8,297.25

The amount of individual restitution correlates with the evidence offered concerning the theft from each individual or entity used to establish aggregated theft in an amount greater than $200,000.

## Analysis

### I. Aggregated Theft

The Penal Code provides that amounts obtained by theft pursuant to one scheme or continuing course of conduct, whether from the same or several sources, may be considered as one offense, allowing for aggregation of the property value in determining the grade of the offense.[5]  Tex. Penal Code Ann. § 31.09. "Aggregated theft is the sum of all its parts." *Dickens v. State*, 981 S.W.2d 186, 188 (Tex. Crim. App. 1998).  "A part is a completed theft whose elements have all been proven." *Id.* Consequently, while the State is not required to prove every individual theft when an individual is charged with the unlawful appropriation of property with an aggregated value pursuant to one scheme or continuing course of conduct, the evidence will not

---

[5]"When amounts are obtained in violation of this chapter pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense." Tex. Penal Code Ann. § 31.09.

be sufficient to sustain a conviction unless the State shows that the defendant illegally appropriated enough property to meet the minimum aggregated value alleged. *Lehman v. State*, 792 S.W.2d 82, 85–86 (Tex. Crim. App. 1990); *Holcomb v. State*, 445 S.W.3d 767, 783 (Tex. App.—Houston [1st Dist.] 2014, pet. dism'd). Aggregation under section 31.09 creates a single offense for purposes of severance, jurisdiction, punishment, limitations, and venue. *Kent v. State*, 483 S.W.3d 557, 561–62 (Tex. Crim. App. 2016) ("Each individual theft and its elements aggregated under Section 31.09 is an element of the single offense created by Section 31.09."); *see Terry v. State*, 397 S.W.3d 823, 830 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

## II. Sufficiency of the Evidence

Because several of Lyon's issues relate to legal sufficiency and the law surrounding "scheme or continuing course of conduct" we note the standard of review and legal principles applicable to our disposition.

### A. Standard of Review

An essential element of due process, as guaranteed by the Fourteenth Amendment, is that the State prove every element of the crime charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979). When assessing the legal sufficiency of the evidence, the reviewing court does not act as a thirteenth juror, reweighing the evidence and substituting its judgment for that of the jury. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *abrogated on other grounds as noted by Guidry v. State*, 9 S.W.3d 133 (Tex. Crim. App. 1999). Instead, we

view the evidence in the light most favorable to the verdict and will uphold the conviction if there is sufficient evidence to justify any rational trier of fact to find the appellant guilty beyond a reasonable doubt on all essential elements of the offense. *Salinas v. State*, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005). But this deferential posture does not relieve us of our responsibility to conduct legal sufficiency reviews to ensure the evidence establishes the elements of an offense. *Queeman v. State*, 520 S.W.3d 616, 631 (Tex. Crim. App. 2017). An appellate court acts as a procedural failsafe against irrational verdicts, and we may reverse a conviction on legal sufficiency grounds where no rational juror could find guilt beyond a reasonable doubt based on the evidence presented. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

We measure the legal sufficiency of the evidence by the statutory elements of the offense as modified by the allegations set out in the indictment. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The evidence may be legally insufficient where the record contains no evidence of an essential element or only a modicum of evidence of one element, or if the record conclusively establishes a reasonable doubt. *Britain v. State*, 412 S.W.3d 518, 520 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 320, 99 S. Ct. at 2789). Evidence that is so weak it creates only a suspicion that a fact exists is no more than a modicum or a scintilla of evidence, and is legally insufficient. *McKay v. State*, 474 S.W.3d 266, 270 (Tex. Crim. App. 2015). While each fact need not point directly and independently to the appellant's guilt, the cumulative force of all

incriminating circumstances must be sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

Where the evidence is sufficient to support conflicting inferences, we must assume the jury resolved the conflict in favor of the verdict. *McKay*, 474 S.W.3d at 270. An appellate court determines "whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper,* 214 S.W.3d at 16–17. An appellate court presumes that the factfinder resolved any conflicting inferences in favor of the verdict and defers to that resolution. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

## B. Continuing Course of Conduct

Lyon argues in several issues that the evidence is legally insufficient to prove the alleged crime was part of a continuing course of conduct pursuant to section 31.09 of the Penal Code. When interpreting a statute, a court must construe words and phrases according to the rules of grammar and common usage unless they have acquired a technical or particular meaning. *Ex Parte Ruthart*, 980 S.W.2d 469, 472 (Tex. Crim. App. 1998); *Johnson v. State*, 187 S.W.3d 591, 603 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). In drafting section 31.09 of the Penal Code, the legislature did not attach a technical or particular meaning to "scheme" or "continuing course of conduct"; thus, we must give the words their common meaning. *See* Tex.

8

Penal Code Ann. §§ 31.01 (West Supp. 2018), 31.09; *Sendejo v. State*, 676 S.W.2d 454, 456 (Tex. App.—Fort Worth 1984, no writ).

### III. Issues 1–3, and 14:  Sufficiency of The Evidence Relating to Thefts of Service and Cranford Transactions

In issues one, two, and three Lyon complains that (1) the theft of currency from Cranford and (2) the theft of Bourland's truck-driving services are too dissimilar from the thefts of fertilizer from other victims to be considered part of the same scheme or continuing course of conduct.  Lyon contends the monetary value ($87,102) attributable to the thefts of currency and services cannot be aggregated with the value of the theft of fertilizer ($158,354.89).  Therefore, according to Lyon, the evidence is legally insufficient to sustain his conviction for theft greater than $200,000. Lyon also complains in issue fourteen[6] that the evidence is insufficient to support theft of services because Bourland failed to provide notice of the amount owed by certified or registered mail as required by Section 31.04(c) of the Penal Code.

### A. Nature of the Offenses

To permit aggregation under section 31.09 of the Penal Code, the theft of services and theft of currency must be part of the same scheme or course of conduct as the thefts of fertilizer.  Therefore, we must briefly review the evidence of course of conduct relating to the thefts of fertilizer.  Lyon obtained fertilizer from Poole, Marc

---

[6]Lyon filed a motion for leave to tender a supplemental brief that was granted which contained Appellant's Point Fourteen.

Watson, and Donnie Martinek and paid with checks later returned for insufficient funds. Lyon obtained fertilizer from Norman by acting as Norman's sales agent and ordering fertilizer from Norman's business for an alleged customer and never providing payment. Lyon also accessed Norman's line of credit with fertilizer supplier CHS and ordered twenty tons of fertilizer in Norman's name. Lyon provided the fertilizer to a paying customer but never repaid Norman or CHS. Lyon removed liquid fertilizer owned by Varian Sisson from a tank owned by Lyon purportedly without Sisson's consent or payment.

## B. Theft of Services Additional Facts

In Issue Three, Lyon asserts that the evidence was legally insufficient to support that the theft of services from Bourland was part of one scheme or continuing course of conduct. Paragraph 10 of the Third Superseding Indictment alleged that Lyon agreed to pay Bourland to transport fertilizer to Oakwood, a small town in Leon County, but after Bourland delivered the fertilizer Lyon refused to pay. Lyon contends that the failure to pay Bourland cannot be part of the scheme or continuing course of conduct because it involved a theft of services rather than theft of fertilizer and because it is a contract dispute.

The evidence reflects that Lyon hired Bourland to transport eight loads of fertilizer to Oakwood, Texas. Over the course of approximately two weeks in December 2012, Bourland transported fertilizer from four different north Texas locations to Oakwood. On one occasion Bourland loaded his truck with fertilizer

10

directly from a Poole truck before delivering it to Oakwood. Bourland gave the customer in Oakwood, Cockerell, two Poole bills of lading for the first two loads of fertilizer Bourland delivered. Cockerell paid Lyon $69,273.65 for the eight loads of fertilizer. Lyon paid Bourland approximately $3,000 after the first three or four loads, but refused to pay him the remainder of his fee for the final deliveries. Bourland called and texted Lyon repeatedly for his money but Lyon refused to pay and offered excuses that he was sick or out of town.[7]

## C. Issues 3 and 14: Analysis of Theft of Services

The indictment specifically charged Lyon with theft of services under Section 31.04(a)(4) of the Penal Code. Specifically, paragraph 1 of the indictment charged Lyon with hiring Bourland to provide transport services Lyon knew were only being done for compensation by agreeing to provide payment—but all the while intending to avoid payment—and then refusing to provide payment after Bourland completed the work and after Lyon had received notice demanding payment.

In his fourteenth issue, Lyon contends the State's evidence was legally insufficient to demonstrate a demand letter was sent with a return receipt requested as required by Section 31.04(c), which is an element of theft of service under Section

---

[7]Section 31.04(a)(4) provides in part: "[A] person commits theft of service if, with intent to avoid payment for service that the actor knows is provided only for compensation . . . (4) the actor intentionally or knowingly secures the performance of the service by agreeing to provide compensation and, after the service is rendered, fails to make full payment after receiving notice demanding payment."

31.04(a)(4) of the Penal Code. In Texas, the offense of theft of service under Section 31.04(a)(4) requires the State to prove: (1) a person, (2) with intent to avoid payment for service he knows to be provided only for compensation, (3) secures the performance of the service by agreeing to provide compensation, and (4) after the service is rendered fails to make full payment, (5) after receiving a notice demanding payment. Tex. Penal Code Ann. § 31.04(a)(4) (West 2016). Section 31.04(c) requires the notice demanding payment to be in writing and be "sent by registered or certified mail with return receipt requested or by telegram with report of delivery requested." *Id.* § 31.04(c). We measure the sufficiency of the evidence against the hypothetically correct jury charge, and the essential elements of the crime are determined by state law. *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012). The hypothetically correct jury charge, accordingly, would require the State to prove: (1) Lyon, (2) with intent to avoid payment for a service he knew to be provided only for compensation, (3) secured Bourland's performance of transporting fertilizer (4) and failed to pay Bourland in full, (5) after the delivery had been made and after having received a notice demanding payment. Tex. Penal Code Ann. § 31.04(a)(4).

Lyon contends that the evidence was legally insufficient to support the demand element of theft. *See Najera v. State*, No. 08-15-00315-CR, 2018 WL 3628215, at *4 (Tex. App.—El Paso July 27, 2018, no pet.) (not designated for publication) (holding no rational jury could conclude beyond a reasonable doubt that notice was sent to appellant in the method required by section 34.01(c) of the Penal Code). In *Najera*, an

owner of a building was charged with theft of services from a roofer of an amount less than $20,000. *Id.* at *2. The prosecution failed to establish that the roofer had sent demand letters by registered or certified mail with return receipt requested to the owner in accordance with section 31.04. *Id.* at *4. The court reversed the owner's conviction and acquitted him because the evidence was legally insufficient to support demand of payment in accordance with the statute. *Id.*

In this case the uncontroverted evidence at trial established that Bourland demanded payment by text messaging and telephone and did not make a demand for payment in accordance with Section 31.04(c). The prosecution bears the burden of proving all elements of the offense charged, and must persuade the factfinder "beyond a reasonable doubt" of the facts necessary to establish each of those elements. *Sullivan v. Louisiana*, 508 U.S. 275, 277, 113 S. Ct. 2078, 2080 (1993); *Patterson v. New York*, 432 U.S. 197, 210, 97 S. Ct. 2319, 2327 (1977); *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 1072 (1970); *Niles v. State*, 555 S.W.3d 562, 570 (Tex. Crim. App. 2018).

We sustain issue fourteen. Because the evidence was legally insufficient to support Lyon's conviction for the offense of theft of service, the amount of $3,700 cannot be aggregated under section 31.09 of the Penal Code. *Lehman*, 792 S.W.2d at 85–86. Because we sustain issue fourteen, it renders issue three moot.

13

**D. Issues 1,2 and 4: Cranford's Investment**

In issues one and two Lyon complains that the evidence was legally insufficient to establish that the theft of currency relating to the clay targets and the theft of currency relating to the transfer of funds from Cranford to Lyon were pursuant to one scheme or continuing course of conduct. In issue four, Lyon complains the evidence establishes nothing more than a breach of contract between Cranford and Lyon.

**1. Additional Facts**

Cranford was a former vocational agriculture teacher and a former assistant farm credit administrator who had known Lyon for twenty to thirty years. Lyon had previously operated a fertilizer business located in Perrin, and Cranford used to do some welding for him. Cranford testified that in 2012 he began investing small amounts of money with Lyon. Lyon had promised Cranford would receive a 17% return on his investments with Lyon. Over the course of six months Cranford provided Lyon with increments of money for investment of between $1,000 and $5,000, and subsequently provided a larger sum of approximately $20,000. Lyon returned this money to Cranford with the promised 17% return from Lyon. In May 2012 the parties decided to go into the target business together. Cranford wire transferred $74,000 to Lyon. The parties agreed Cranford would receive 49% of Lyon's business in shooting clays and targets, and on the sale of eleven trailer trucks full of clay pigeon targets Cranford would get his investment plus 17% back.

14

Cranford never saw the trucks or the clay pigeons and he never received his money back. Cranford and Lyon did not have anything in writing confirming Cranford's interest in the business, but they rented an office in Mineral Wells for a couple of months to facilitate the business. Lyon was supposed to make Cranford an officer of the company, formalize the corporate documents, and submit them to the Texas Secretary of State. Cranford asked for copies of the documents but never received them. As security for Cranford's investment of $74,000, Lyon provided an undated check for $74,000 to Cranford allegedly so that if Lyon died or other circumstances occurred Cranford would get his money back.

As part of the alleged scheme Lyon told Cranford to move his banking from Jacksboro and Mineral Wells to Amegy Bank in Dallas to facilitate transfers between Cranford's account and the business account under Lyon's control at Amegy. After Cranford moved his account to the Amegy Bank, he discovered that a forged email had authorized the transfer of $8,915 from his account to Lyon's Amegy Account. Cranford demanded his money back and closed his Amegy account. Cranford terminated his relationship with Lyon and deposited Lyon's $74,000 check, but it was returned for insufficient funds. Lyon never returned the $8,915 improperly transferred from Cranford's account or the $74,000 investment.

## 2. Analysis

In Issue One Lyon contends the investment in the shooting target business is too distinct from the fertilizer transactions to be part of the same continuing course

15

of conduct.  The State contends that the transaction has some of the same hallmarks as the fertilizer transactions including Cranford's investment in and receipt of a hot check from RMS, the entity that issued hot checks in some of the fertilizer transactions.  Lyon also gave the same excuses for non-payment to Cranford that he gave to the fertilizer victims, i.e. he was out of town, sick, or tied up.  Finally, the State contends the "failure to repay is the important similarity amongst all of these incidents" and the only difference is the type of goods being sold by deception to each of the victims.

Lyon directs us to *Riley v. State*, 312 S.W.3d 673 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd), which involved a builder's failure to complete four buildings. In each instance the builder received money, created plans, and then failed to complete the buildings. *Id.* at 674.  The Court held that the transactions were similar enough to support the jury's implicit finding that they constituted one scheme or continuing course of conduct. *Id.* at 677.  However, in footnote 1, the Court stated:

> We assume, without deciding, that inherently dissimilar kinds of theft, *e.g.*, appropriating a cow in West Texas and appropriating a checkbook in Dallas, would be susceptible to a legal- and factual-sufficiency challenge if they were aggregated into a single offense.

*Id.* at 677 n.1.

The State directs us to *Agbeze v. State*, No. 01-13-00140-CR, 2014 WL 3738048 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (mem. op., not designated for publication), which involved fraudulent Medicaid reimbursement claims.  In *Agbeze*,

16

several fraudulent acts were held sufficient to permit aggregation of theft amounts. First, Agbeze submitted claims for the maximum allowed number of products for clients without documentation demonstrating a need for the products. *Id.* at *1. Second, Agbeze billed for products with the highest reimbursement rates whether the products were needed or requested; and third, Agbeze failed to deliver all the billed products to some of his clients. *Id.* at *1–2. The court noted:

> [T]he State did not have a burden of proving that Agbeze had a systematic prior intent or scheme to commit theft in every incident evidenced at trial. Rather, based on the common meaning of the terms "scheme" and "continuing course of conduct," the State only had to present evidence that Agbeze's actions were sufficiently linked to support the jury's conclusion to aggregate the offenses.

*Id.* at *7. *See, e.g.*, *Keck v. State*, No. 14–07–00933–CR, 2009 WL 3003257, at *5 (Tex. App.—Houston [14th Dist.] Apr. 2, 2009, no pet.) (mem. op., not designated for publication) (upholding aggregation of thefts when evidence showed that defendant had sole access to bank deposit slips necessary to commit 148 instances of theft from his employer); *Johnson,* 187 S.W.3d at 603 (continuing scheme found when individual obtained funds from seven different attorneys based on false story of needing representation due to injury on an oil rig).

This case involves Lyon's wrongful appropriation of fertilizer and services to transport the fertilizer combined with the wrongful appropriation of currency related to Cranford. Although multiple thefts committed pursuant to one scheme or continuing course of conduct at different times and against different people may be

17

aggregated within one offense, the issue is whether the theft of currency from Cranford was pursuant to one scheme or continuing course of conduct that included the other alleged thefts of fertilizer and services.

This case is distinguishable from *Agbeze* and *Johnson* in that the same means or method of appropriation were not used, the goods involved are not similar, and there is no link between the alleged investment opportunity in sporting clays and the wrongful appropriation of fertilizer. Lyon's scheme with Cranford included inducing Cranford to invest in a clay sporting venture based on the promise of a large financial return, and convincing Cranford to move his account to Lyon's bank and then forging emails to obtain funds from Cranford's bank account. *See id.* at 677 n. 1 (assuming inherently dissimilar kinds of theft, e.g. appropriating a cow in West Texas and appropriating a checkbook in Dallas, would be susceptible to challenge if aggregated) The victims of the fertilizer theft sold fertilizer to Lyon based on a false promise to pay. The State contends the "same failure to repay is the important similarity amongst all of these incidents." But the failure to repay is an element of the theft and is insufficient on its own to establish one scheme or continuing course of conduct. There is simply no evidence in the record linking the thefts of fertilizer and services relating to the fertilizer to the theft of currency from Cranford. We conclude that viewing the evidence in the light most favorable to the jury's verdict and considering the combined evidence and the reasonable inferences from that evidence, a rational trier of fact could not have found that the theft from Cranford was part of one

18

scheme or continuing course of conduct sufficient to aggregate the amount attributable to the thefts from Cranford to the aggregated theft judgment. *See Kent*, 483 S.W.3d at 561–62 (each individual theft and its elements aggregated under 31.09 is an element of the single offense).

We sustain issues one and two. Because we hold the evidence legally insufficient to support appropriation of currency pursuant to one scheme or continuing course of conduct, the amount attributable to the thefts from Cranford of $82,910 may not be aggregated with the other thefts to support the judgment. Because we so hold, issue four is moot.

## IV. Issues 5 and 6: Theft from Norton

In issues five and six Lyon complains the evidence was legally insufficient to support the theft from Norman. Lyon first complains that there was a material variance in the proof between the alleged stolen item (fertilizer) and the evidence which at best shows a dispute over proceeds from the sale of fertilizer. Lyon also complains that the evidence shows the parties had an agreement which Lyon partially performed and therefore there was no evidence of criminal intent. The State responds that the record reveals two transactions in which Lyon obtained fertilizer without ever paying and that no part of the business agreement with Norman was ever performed.

Paragraph 8 of the Indictment states:

[O]n or about September 21, 2012 in Fannin County, Texas the defendant did then and there unlawfully appropriate, by acquiring or otherwise exercising control over, property, to-wit: fertilizer, of the value of $1,500 or more but less than $20,000 from Jay Norman, the owner thereof, without the effective consent of the owner, as said consent was gained by deception, to-wit: by inducing delivery of fertilizer by a false promise to pay in full for said fertilizer, and with the intent to deprive the owner of the property

The Judgment and Sentence ordered Lyon to pay restitution to Jay Norman in the amount of $4,834.37.

## A. Additional Facts

Norman is a farmer and has an agriculture business where he sells seed, chemicals, and fertilizer. Norman testified that he entered into an agreement whereby Lyon would be a dealer for Norman's agricultural products, including fertilizer, in exchange for a commission. According to Norman's testimony, Lyon was supposed to sell Norman's products to farmers and once the sale was negotiated the customer would write a check payable to Norman, who would then pay Lyon a commission. On more than one occasion, Lyon sold fertilizer that was provided by Norman, and the customer paid Lyon, but Lyon never forwarded payment to Norman. In addition to selling Norman's fertilizer and not providing the customer's payment, Lyon also obtained a load of fertilizer in the amount of $11,947.60 from CHS, a fertilizer company, using Norman's line of credit without authorization. Lyon made excuses to Norman for failing to pay and ultimately provided three checks that were returned for

insufficient funds. According to Norman's bookkeeper, Rose Gandillon, Lyon eventually made a cash deposit in partial payment of the amount Lyon owed Norman.

Gandillon testified at trial that Lyon was supposed to provide the names of any customers who purchased fertilizer so Gandillon could invoice them for payment. The customer was supposed to pay Norman directly. Lyon never provided customer information to Gandillon when he ordered fertilizer from Norman. Thus, Gandillon could not bill the purported customers. Instead, Lyon gave Gandillon three signed checks to use to pay for fertilizer, but they were returned for insufficient funds.

## B. Issue 5: Analysis of Variance

Lyon complains in issue five that there is a material variance between the charge and the proof because Norman consented to the delivery of fertilizer to customers and if anything was wrongfully appropriated it was the proceeds from the sales, not fertilizer.

Under Texas law, a variance between the allegations in the indictment and the evidence at trial is a matter of evidentiary sufficiency. *Gollihar v. State*, 46 S.W.3d 243, 246–47 (Tex. Crim. App. 2001). In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2781; *see also Geick v. State*, 349 S.W.3d 542, 545 (Tex. Crim. App. 2011); *Cada v. State*, 334 S.W.3d 766, 773–74 (Tex. Crim. App. 2011).

21

"[W]hen faced with a sufficiency of the evidence claim based upon a variance between the indictment and the proof, only a 'material' variance will render the evidence insufficient." *Gollihar*, 46 S.W.3d at 257. A variance is material, or "fatal[,] only if it . . . prejudices [the defendant's] substantial rights." *Id.* (citations omitted). A defendant's substantial rights are not prejudiced so long as "the indictment, as written, informed the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial" and "the deficiently drafted indictment would [not] subject the defendant to the risk of being prosecuted later for the same crime." *Id.* (citations omitted). "[A] hypothetically correct charge need not incorporate allegations that give rise to immaterial variances." *Id.* at 256.

Lyon alleges there is no evidence Lyon unlawfully appropriated fertilizer from Norman because under their business arrangement, Norman consented to provide fertilizer to customers and any wrongful appropriation is over the proceeds from those sales. The indictment specifically alleges theft of fertilizer "without the effective consent of the owner, as said consent was gained by deception, to-wit: by inducing delivery of fertilizer by a false promise to pay in full for said fertilizer, and with the intent to deprive the owner of the property." Evidence was submitted at trial that Lyon submitted an order for fertilizer worth $3,397 to Norman, and the fertilizer was delivered to Lyon who failed to provide any payment or customer information to Gandillon. Likewise, there was evidence that Lyon ordered approximately twenty tons of fertilizer from CHS using Norman's line of credit without authorization. The

fertilizer was ultimately delivered to a customer who paid Lyon. However, the invoice from CHS to Norman introduced at trial reflected that Lyon was the initial recipient of the fertilizer. Thus, based on the evidence, the jury could find that Lyon wrongfully appropriated fertilizer and not just proceeds from Norman. We hold there was no variance between the indictment and the proof. We overrule issue five.

### C. Issue 6: Analysis of Criminal Intent

Lyon claims in issue six that his transactions with Norman reflect a soured business deal and partially-performed contract rather than theft. Thus, he argues, there is legally insufficient evidence of criminal intent to support a conviction. First, both Norman and Gandillon stated the agreement with Lyon was that the final customer would pay Norman directly, and not Lyon. Gandillon never received the appropriate billing information from Lyon so she could bill the customer as agreed. Lyon repeatedly made promises to pay, and three checks that were provided by Lyon were returned for insufficient funds. Lyon used Norman's CHS line of credit, without permission, to order and receive fertilizer for which Lyon never paid.

The indictment alleged Lyon committed theft of fertilizer "by deception" from Norman by acquiring fertilizer from him without his effective consent. Consent is not effective if it is induced by deception. Tex. Penal Code Ann. § 31.01(3)(A). As discussed previously, the charge used the definition of deception outlined in subsections 31.01 (1)(A) and (E). When the State charges theft by way of deception, it is bound to prove deception. *Fernandez v. State*, 479 S.W.3d 835, 838 (Tex. Crim.

23

App. 2016) (citing *Geick*, 349 S.W.3d at 548). To prove theft by deception, the State must show that the owner of the misappropriated property was induced to consent to its transfer because of a deceptive act of the defendant. *Id.* (citing *Daugherty v. State*, 387 S.W.3d 654, 659 (Tex. Crim. App. 2013)). "That is, the defendant's deceptive act must impact the judgment of the property owner in the transaction." *Id.*

Viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found Lyon, by deception, induced Norman to provide fertilizer to Lyon by representing customers would pay Norman directly for the fertilizer and Lyon would receive a commission from Norman. Lyon created or confirmed by his words and actions a false impression of fact that was likely to affect Norman's judgment.

Lyon asserts that he partially performed the agreement with Norman, thereby precluding a finding of criminal intent. *See Jacobs v. State*, 230 S.W.3d 225, 231–32 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (partial performance negated criminal intent). Here, there is substantially more evidence of deception than there is of a mere failure to perform under a contract. Notably, the charge included a definition of deception based on creating a false impression of law or fact[8] in addition to promising performance "that the actor does not intend to perform or knows will not be performed." *See* Tex. Penal Code Ann. § 31.01(1)(E). Evidence of partial

---

[8] *See* Penal Code § 31.01(1)(A).

performance under a contract is not relevant to a charge that an actor induced the property owner's consent to a contract by creating a false impression of law or fact. *Lopez v. State*, 316 S.W.3d 669, 676–77 (Tex. App.—Eastland 2010, no pet.). The Court of Criminal Appeals agrees, holding that "[t]he fact that partial or even substantial work has been done on a contract will not invariably negate either the intent to deprive or the deception necessary to establish the unlawfulness of the initial appropriation." *Taylor v. State*, 450 S.W.3d 528, 537 (Tex. Crim. App. 2014). Accordingly, partial performance under the contract has no bearing on Lyon's intent reflected by his deception in creating a false impression of law or fact. We overrule issue six.

## V. Issue 7: Motion to Quash the Indictment

Lyon filed a motion to quash paragraphs 1–10, 13, 14, and 17 of the Superseding Number 3 Indictment for the failure to sufficiently describe the property or chemical composition of the property appropriated. Each of the paragraphs involved the unlawful appropriation of fertilizer or the theft of service by transporting fertilizer. The trial court overruled Lyon's motion to quash.

### A. Standard of Review

We conduct a de novo review of a trial court's ruling on a motion to quash the indictment. *State v. Rosseau*, 396 S.W.3d 550, 555 n.6 (Tex. Crim. App. 2013) (citing *Smith v. State*, 309 S.W.3d 10, 13–14 (Tex. Crim. App. 2010)); *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004). We conduct a de novo review because the

25

sufficiency of a charging instrument is a question of law. *Rosseau*, 396 S.W.3d at 555 n.6 (citing *Smith*, 309 S.W.3d at 13–14); *Moff*, 154 S.W.3d at 601. As noted by the court in *Moff*, when the resolution of a question of law does not depend on the credibility and demeanor of a witness, the trial court is in no better position than the appellate court to make the determination, and therefore, a de novo review is the appropriate standard. 154 S.W.3d at 601. Here, the trial court's decision was based on the indictment, the motion to quash, and argument of counsel. Thus, the trial court was in no better position than we are now with regard to determining whether the indictment provided Lyon with sufficient notice. We therefore apply the de novo standard of review. *See id.*

### B. Notice

The right of a defendant to notice of the State's accusations is set forth in the federal and state constitutions. *See* U.S. Const. amend. VI; Tex. Const. art. I, § 10. "Thus, the charging instrument must be specific enough to inform the accused of the nature of the accusation against him so that he may prepare a defense." *Moff*, 154 S.W.3d at 601. The Texas Code of Criminal Procedure provides guidelines with regard to the sufficiency of an indictment. Specifically, Article 21.11 provides:

> An indictment shall be deemed sufficient which charges the commission of the offense in ordinary and concise language in such a manner as to enable a person of common understanding to know what is meant, and with that degree of certainty that will give the defendant notice of the particular offense with which he is charged, and enable the court, on conviction, to pronounce the proper judgment . . . .

Tex. Code Crim. Proc. Ann. art. 21.11 (West 2009). In a case of aggregated theft under Section 31.09, the indictment must allege the "continuing course of conduct" element, but there is no pleading requirement that it include the specific acts of theft that are aggregated. *Kellar v. State*, 108 S.W.3d 311, 312 (Tex. Crim. App. 2003).

In *Kellar*, the defendant was indicted for theft. *Id.* at 312. The indictment alleged Kellar, over the course of more than two years, unlawfully appropriated property "pursuant to one scheme and continuing course of conduct" with an "aggregate value" of "$100,000 or more" without the owner's consent. *Id.* Like Lyon, Kellar filed a motion to quash the indictment, asserting the indictment did not provide sufficient notice because it failed to state "specifically each separate alleged offense or theft, by date, alleged complainant, amount, location and type of property taken." *Id.* Kellar claimed the lack of notice precluded him from adequately preparing a defense. *Id.* The trial court denied Kellar's motion, and the appellate court affirmed. *Id.*

On review, the court of criminal appeals acknowledged that section 31.09 of the Penal Code permits conduct that occurs pursuant to one scheme or continuing course of conduct to be considered one offense and the amounts allegedly taken aggregated to determine the grade of the offense. *Id.* (citing Tex. Penal Code Ann. § 31.09). The court held that in "a case of aggregated theft under 31.09, the indictment must allege the 'continuing course of conduct' element, but there is no pleading requirement that it include the specific acts of theft that are aggregated." *Id.* at 313.

27

Although the court agreed a defendant has a constitutional right to sufficient notice so as to allow him to prepare a defense, that notice need not come only from the charging instrument, but may be satisfied by other means. *Id.* The "due process requirement may be satisfied by means other than the language in the charging instrument. When a motion to quash is overruled, a defendant suffers no harm unless he did not, in fact, receive notice of the State's theory against which he would have to defend." *Id.; see State v. Castorena*, 486 S.W.3d 630, 633 (Tex. App.—San Antonio 2016, no pet.).

In *Kellar*, the defendant had actual notice of the specific instances of theft upon which the State had based its allegations through access to binders containing documentation of more than one hundred transactions showing instances of theft. 108 S.W.3d at 314. As in this case, the State in *Kellar* filed copies of business records and affidavits showing the thefts in question. *Id.* The court held that the trial court properly overruled Kellar's motion to quash. *Id.*

In this case the State filed voluminous business records affidavits along with the banking records of Lyon as well as bills of lading, emails, personal checks and bank receipts. The receipts and bills of lading detailed the type of fertilizer allegedly stolen. In addition, the State filed two lengthy notices of compliance pursuant to Article 39.14(j) of the Texas Code of Criminal Procedure that document the extensive pre-trial discovery the State provided to Lyon. Over a thousand pages of records were provided to Lyon in support of the allegations in the indictment. Lyon had

28

actual notice of each of the specific instances of theft and the evidence the State would use to support its allegations. Lyon fails to mention *Kellar* and its progeny in his brief and directs us to pre-*Kellar* cases that do not discuss receipt of actual notice of the specific instances of theft through discovery materials.

We conclude Lyon was fully informed of the accusations made against him and could adequately prepare his defense. We overrule issue seven.

## VI. Issues 8 and 9: Evidence of Theft Involving Varian Sisson

In issues eight and nine Lyon complains that the evidence was legally insufficient to support the fertilizer theft from Varian Sisson because (1) Lyon owned the tanks and had authority to remove fertilizer from them; therefore, there was a material variance in the proof; and (2) the transaction involved a contract which Lyon partially performed, thereby negating criminal intent. The State responds that although the evidence shows that Lyon had Mr. Sisson's consent to move and sell fertilizer out of the tanks, Sisson never consented to Lyon removing all the fertilizer.

### A. Additional Facts

Prior to the alleged theft from Sisson, Lyon had placed approximately five tanks on Sisson's property to hold liquid fertilizer. Sisson then purchased fertilizer from Lyon and placed it in the tanks for use on Sisson's property. Sisson testified that in 2012 he and Lyon entered into a business relationship. Sisson agreed to help Lyon purchase fertilizer. Lyon would then sell the fertilizer, and they would split the profits. Before entering into their first transaction, Sisson took a picture of the tanks

and recorded the amount of his fertilizer currently in the tanks. Sisson recorded the levels in inches and converted the inches to gallons, with Lyon's assistance, to come up with a total value of $4,875.21 for the liquid fertilizer. According to Sisson, based on this figure, Lyon knew how much Sisson needed to be compensated or how much fertilizer needed to be replaced once the parties began purchasing fertilizer together. Sisson testified that "whenever the fertilizer disappeared, I went back and put down the cost of it so I knew how much was to be reimbursed to me or how many inches of fertilizer to be reimbursed to me, one or the other."

In furtherance of their business, Sisson and Lyon purchased additional fertilizer and comingled the fertilizer in the tanks. Sisson complained that when he returned from a vacation in approximately May 2012, all the fertilizer was removed from the tanks, and he was not repaid for his portion of the fertilizer. Lyon told Sisson that he had to move the fertilizer to sell the fertilizer. Sisson testified, "[Lyon] had permission to move the fertilizer, to sell the fertilizer, but I think that my fertilizer just got mixed up in the batch or something. I don't know if it was intentionally taken or if it was just ordered to go get the fertilizer." When asked if he had been paid for the fertilizer, Sisson testified that "I've gotten repayment for the total debt owed, however you would like to show that money. . . . But I have gotten - - he owed me a larger sum of money and he has paid me off and on throughout the years to get the debt down." When asked again if Lyon paid for that fertilizer Sisson stated: " I don't know if that

money - - the money was applied toward the total debt." Sisson was then asked if there was still a debt, and Sisson responded affirmatively.

Paragraph 9 of the indictment alleged in part:

[T]he defendant did then and there unlawfully appropriate, by acquiring or otherwise exercising control over, property, to-wit: by removing fertilizer from a tank controlled by Varian Sisson, the owner thereof, of the value of $1,500 or more but less than $20,000 from Varian Sisson, without the effective consent of the owner, as said consent was not given, and with the intent to deprive the owner of the property.

The charge had identical language. In its judgment the trial court ordered restitution to Sisson in the amount of $4,875.21.

## B. Analysis

As noted above, legal sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Wooley v. State*, 273 S.W.3d 260, 268 (Tex. Crim. App. 2008); *Malik*, 953 S.W.2d at 240. A reviewing court may not re-weigh the evidence or replace the jury's judgment with its own. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). The credibility of witnesses and the weight to be given their testimony is judged exclusively by the jury. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996); *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994). To determine whether the amount related to the theft from Sisson may be aggregated we must determine if the evidence is sufficient to support that Lyon

31

unlawfully appropriated the fertilizer without the effective consent of Sisson. *See Kent*, 483 S.W.3d at 561.

In issue eight Lyon contends that the evidence, including Sisson's testimony, establishes Lyon had consent to remove the comingled fertilizer and sell the same. According to Sisson's testimony he and Lyon entered into a business relationship where they would buy fertilizer, store it in Lyon's tanks, and sell the fertilizer and split the profits. Sisson measured the amount of fertilizer in the tank so he would know either the amount of money he was due or the amount of fertilizer owed. Sisson clearly anticipated that his fertilizer would be comingled with new product and would be sold, but he expected to be paid or reimbursed for the fertilizer taken. "[W]henever the fertilizer disappeared, I went back and put down the cost of it so I knew how much was to be reimbursed to me or how many inches of fertilizer to be reimbursed to me, one or the other." In its brief the State agrees that "[Lyon] had permission to move and sell fertilizer as part of their business" but asserts that "Sisson never directly stated that he consented to the removal of such fertilizer." However, it was the State's burden to establish that Lyon did not have consent to remove the fertilizer, and Sisson's alleged failure to directly state that he consented to the removal is not evidence of lack of consent particularly in view of his other testimony.

The evidence was undisputed that Lyon had permission to sell the fertilizer in the tanks including Sisson's portion of the comingled fertilizer. Sisson anticipated the

32

comingling of fertilizer and the ultimate removal and sale of his fertilizer with payment for it either in cash or in fertilizer. The State failed to prove the fertilizer was removed without the effective consent of Sisson. Consequently, the evidence is insufficient to support the aggregation of $4,875.21 attributable to the Sisson theft.

We sustain issue eight and therefore do not address issue nine as moot.

## VII.   Issues 10 and 11: Stan Stephens's Fertilizer

In Paragraph 13 of the indictment the State alleged that Lyon unlawfully appropriated fertilizer from a tank controlled by Stan Stephens. The trial court aggregated this theft with the others and ordered restitution to Stephens in the amount of $3,700. The State acknowledges that at trial Stevens testified that he consented to Lyon's removal of the fertilizer, and there was no evidence to the contrary. The State concedes the error of the trial court in including this transaction in the aggregated theft judgement and urges us to deduct the value of the court ordered restitution of $3,700 from the overall figure of restitution. We sustain Lyon's issues ten and eleven.

## VIII.  Issues 12 and 13: Theft from Donnie Martinek

In issues twelve and thirteen, Lyon contends that the State's evidence was insufficient to prove the theft of fertilizer from Donnie Martinek because (1) there was insufficient evidence that consent was gained by deception; and (2) the parties had a business deal that was partially performed. The State responds that this

33

transaction is another example of Lyon buying fertilizer and writing hot checks with no intention of paying for the product.

**A. Additional Facts**

Lyon called Donnie Martinek as his only witness. Martinek was president of Martinek Grain and Fertilizer. Martinek testified that he had known Lyon for a number of years and they had done a number of deals together. Lyon purchased fertilizer from him and made payments. From time to time Lyon's checks were returned for insufficient funds. Martinek testified that he did not want to pursue charges for the insufficient checks against Lyon. Mark Miller, Martinek's bookkeeper, testified Lyon bought $8,297.95 worth of nitrogen fertilizer and the check for payment "bounced." Martinek acknowledged that Lyon still owed him for the load of fertilizer and that his company had to write off over $200,000 worth of debt Lyon owed Mr. Martinek.

> Paragraph 17 of the indictment alleged:
>
> [O]n or about December 20, 2013 in Collin County, Texas the defendant did then and there unlawfully appropriate, by acquiring or otherwise exercising control over, property, to-wit: fertilizer, of the value of $1500 or more but less than $20,000 from Martinek Grain and Fertilizer or Donnie Martinek, the owner thereof, without the effective consent of the owner, as said consent was gained by deception, to-wit: by presenting payment for the fertilizer on an account with insufficient funds to pay for said fertilizer, and with the intent to deprive the owner of the property.

In its Judgement and Sentence and Order for Restitution, Lyon was ordered to pay restitution to Martinek of $8,297.95.

34

**B. Analysis**

The State alleged in the indictment and charge that Lyon unlawfully appropriated fertilizer without the effective consent of the owner "as said consent was gained by deception." According to Lyon there was a material variance in the allegation and the proof offered. Martinek did not testify that he was deprived of property unlawfully or through deception. Lyon also argues that they had a contractual arrangement that precludes a finding of criminal intent. The State responds that there was contradictory evidence because Miller testified concerning Lyon's purchase of and failure to pay for the fertilizer.

There was conflicting evidence in the record concerning Lyon's purchase and failure to pay for the fertilizer. Although there was a discussion of prior dealings between the parties, there was no discussion of a specific business arrangement regarding the sale of fertilizer at issue. Although Martinek testified that he did not desire to prosecute Lyon, his bookkeeper, Miller, testified to the sale of fertilizer and the failure to pay. The trier of fact is the sole judge of the credibility of the witnesses and of the strength of the evidence. *Fuentes v. State,* 991 S.W.2d 267, 271 (Tex. App. 1999). Jurors are permitted to reach multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. *Hooper*, 214 S.W.3d at 15. When conflicting inferences can be drawn from the evidence, it is presumed that the jury resolved the conflict in favor of the prosecution, and the court should defer to

the jury's finding. *Clayton*, 235 S.W.3d at 778. The appellate court may not re-weigh the evidence and substitute its judgment for that of the jury. *King*, 29 S.W.3d at 562.

Although Martinek did not want to prosecute Lyon, he acknowledged that he expected to be paid for products sold to Lyon and that he had received insufficient fund checks instead of payment. Miller testified that the business records reflected a sale and lack of payment. There was evidence of lack of consent, and there was no evidence that the particular sale involved a contractual agreement between the parties.

Based on the evidence we overrule issues twelve and thirteen.

**Conclusion**

Because we sustain issues one, two, eight, ten, eleven, and fourteen, the amount of money aggregated by the trial court for determining the grade of the offense and the amount of restitution was incorrect. We must reduce the aggregated value of $245,456.89 by the amounts erroneously attributed to thefts against:

Brian Bourland: $4,192.00

Donald Cranford: $82,910

Varian Sisson: $4,875.21

Stan Stevens: $3,700

Because the aggregated amount following the reduction is $149,779.68, it falls below the theft of property with an aggregated value of greater than $200,000 of which Lyon was convicted. *See* Act of May 9, 2011, 82nd Leg., R.S., ch. 120, § 1 (e)(6), 2011 Tex. Gen. Laws 609, 610 (amended 2015) (designating theft in an amount

36

over $200,000 as a first-degree felony and theft in an amount under $200,000 as a second-degree felony). By finding that Lyon committed theft in an amount over $200,000, the jury clearly found that Lyon committed theft in an amount less than $200,000, a lesser-included offense. *Id.* We therefore reform the trial court's judgment to that of second-degree-felony theft of property with an aggregated value between $100,000 and $200,000. *Thornton v. State*, 425 S.W.3d 289, 299–300 (Tex. Crim. App. 2014) (holding that when a court of appeals concludes that evidence is insufficient to support a conviction it may reform the judgment to reflect a lesser-included offense if the evidence is sufficient support a conviction of the lesser-included offense). We remand the case to the trial court for a new punishment trial.

/s/ Rebecca Simmons

REBECCA SIMMONS
VISITING JUSTICE

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: December 27, 2018

37